[Civ. No. 24628. Second Dist., Div. Three. Mar. 29, 1961.]

GARBRIELLE P. KINGERY et al., Respondents v. SOUTH-
ERN CALIFORNIA EDISON COMPANY (a Corpora-
tion) et al., Defendants; FEDERAL EMPLOYEES
DISTRIBUTING COMPANY (a Nonprofit Corporation)
et al., Appellants.

Schell & Delamer, Richard B. Goethals, Allan S. Garber and Arthur M. Reilly for Appellants.

Shacknove & Goldman, James Wolf and Ben F. Goldman, Jr., for Respondents.

FORD, J.—The plaintiffs are the widow and children of Raymond Otey Kingery, deceased. In an action for wrongful death, they recovered a judgment against defendants Union Development Company, Inc., and Federal Employees Distributing Company. These defendants, hereinafter designated as Union and Federal respectively, have appealed from the judgment. While Southern California Edison Company was originally named as a defendant, a covenant not to sue was

executed in favor of that defendant prior to the trial of the action.

Union operated a shopping center known as the Dutch Village. About 35 shops were on the premises. Federal was engaged in a retail business on a portion of the property under a lease which it had from Union. In 1954, Federal erected a sign at its own expense adjacent to a driveway which led from an adjoining street onto the property; Union and Federal mutually agreed as to its location. The body of the sign was approximately 10 or 12 by 16 or 18 feet in size and was elevated by means of standards so that the top thereof was about 25 feet above the ground. It was illuminated by floodlights. The purpose of the sign was to indicate the location of Federal's business since its building was about 300 feet away from the street near which the sign was placed. In 1956, Federal entered into an agreement with Kingery's employer, Heath and Company, under which neon lighting was to be installed on the numerals and a metal molding placed around the perimeter of the sign. On November 20, 1956, in the course of executing such work, Mr. Kingery suffered injuries resulting in his death.

Andro Trinajstich, a journeyman electrician, was a sign-hanger for Heath and Company and worked with Mr. Kingery on November 19 and 20, 1956, on the Federal sign at the Dutch Village. He testified that the decedent was a journeyman electrician and experienced in working with electricity. The witness described the sign as being approximately 10 by 16 feet or 10 by 18 feet in size; the top of it was about 25 feet from the ground. On the first day, when the witness and the decedent arrived at the site of the sign they checked as to the presence of high-voltage wires. They determined that there was such a wire to the south of the sign, within 8 or 9 feet of the south portion of the sign, and at a height which was about 5 feet above the top of the sign itself. On November 19, the two men placed ladders against the sign; they removed the floodlights and the floodlight arms and completed all the neon wiring. On that day, in connection with their observation of the high-tension wires, they discussed the matter of "where to position the boom [which was on their truck] the following day for picking up these metal sections." The witness further testified as follows: "It is more or less a normal procedure on any of the jobs, and we are using this metal boom to notice all wires in the air in the

area. It is more or less a safety measure that you naturally get used to working with.''[1]

On November 20, which was a clear, sunny day, Trinajstich and the decedent set the boom in position on the north side of the sign for the purpose of raising the metal sections of molding into place. The truck was 20 to 25 feet away from the sign. Kingery hooked a piece of molding onto the cable of the boom and held the molding with one hand as he went up a ladder which was placed against the sign. Trinajstich raised the molding by means of the cable. When the section of the molding was at the top of the sign, Kingery yelled to Trinajstich that it had to be reversed. Kingery asked him to raise it about a foot so that he could spin it around and set it back down on top of the sign again. At that time the top portion of Kingery's body was above the sign. Trinajstich's view of the wires was then blocked by the sign. The witness testified that as Kingery was revolving the molding, ''there was a loud arc or buzzing sound'' and Kingery released his hold on the molding, grabbed for the top of the sign, and fell to the ground where he landed on his head and shoulders. The witness did not actually see an arc but there was ''a burned spot about 6 or 7 inches on one end of the molding.''

Trinajstich testified that there was a warning sign on each side of the base of the boom which read as follows: ''It is unlawful to operate this equipment within 6-foot [sic] of any high-tension lines or high-voltage lines.'' On the first day, he and Kingery discussed the fact that they were in an area where such warning applied. As to whether it was necessary to use the boom on this particular job, Trinajstich testified: ''We could have done the job without it. . . . [I]t could have been worked without the boom, but to both Ray and I it seemed a lot easier to handle that length of a section, which was 13 or 14 feet long and at that height. . . . It [the section of molding] was real light, around 60 or 65 pounds. It was not the weight. It was just the awkwardness of it that made us use the boom.'' Without the boom, he said, the sec-

[1] In the course of his opening statement to the jury, counsel for the plaintiffs stated as follows: ''On the first day, there was a discussion between Mr. Trinajstich and Mr. Kingery about the best way to do it, and where they should place their boom, and how it would be the most easily done. There is no question about the fact that they at that time noticed the high-tension wires. They were there, and there was a notice, a small notice, that is placed on the poles, under the law, to indicate that there is high-tension wiring there.''

tion could have been carried on the shoulders of two men. It was "quite a long piece of metal and it was flimsy." He and Kingery decided to use the boom to raise it. On neither day did Trinajstich see or talk to anyone from Union or Federal.

Donald Ladhoff was called as a witness on behalf of the plaintiffs. He had formerly been employed as a lineman by the Southern California Edison Company. On November 20, 1956, as a deputy sheriff, he investigated the accident. He estimated that the height of the sign was approximately 25 feet. The high-voltage wires were 3 to 5 feet higher than, but were not directly above, the sign; the closest wire was approximately 8 feet south of the sign. The piece of metal which had been raised was approximately 17 feet long; there were burn marks on or near the end of it.

F. G. Von Mueffling, the general manager of Federal, was called as a witness by the plaintiffs under section 2055 of the Code of Civil Procedure. He described the Dutch Village as being a shopping center having "several major stores and service stores," with "community parking and community traffic." He did not recall whether the proposed changes in the sign were discussed with any representative of Union or whether Union was informed that the work was going to be done. Federal took no steps to have the high-voltage wires de-energized during the time the work was to be in progress.

Neil A. Fitzgerald, the secretary of Union, was called as a witness by the plaintiffs pursuant to the provisions of section 2055 of the Code of Civil Procedure. His duties included the care of the buildings belonging to Union. He was aware of the high-tension wires. He testified that he had no conversation with anyone representing Federal with respect to the alteration of the sign. His permission was not asked and he knew of no request for permission made to anyone else in his company. He did not know the work was going to be done. He was not in town on November 19 and 20, 1956. He was not aware of any action on the part of Union in preparation for such work. R. E. Ibbetson, Sr., the president of Union, was called as a witness by the plaintiffs under the same procedure. He testified that he talked to no one at Federal with respect to the alteration of the sign and was not aware that the work was going to be done; he did not see the work while it was in progress. His office was not in the Dutch Village. Edwin T. Ibbetson, vice president of Union, was also examined on behalf of the plaintiffs under section 2055

of the Code of Civil Procedure. He testified that the power lines were in existence when the sign was originally erected.

 The duty of an owner or occupant of real property toward a workman on the premises is stated in *Miller* v. *Pacific Constructors, Inc.*, 68 Cal.App.2d 529, at page 545 [157 P.2d 57] : "The general rule in that regard is that an owner or occupier of premises, who, by invitation express or implied, whether the invitation is pursuant to a written contract or otherwise, induces, or knowingly permits, a workman to enter the premises for the performance of duties mutually beneficial to both parties, is required to use reasonable care to protect the workman by supplying him with a reasonably safe place in which to work and to furnish and maintain appliances in connection therewith which are reasonably safe for the purposes embraced therein." (See also *Bickham* v. *Southern Calif. Edison Co.*, 120 Cal.App.2d 815, 819 [263 P.2d 32].) In a case where the danger to employees of an independent contractor arose because of the use of a boom near power lines after dark, the owner of the premises having control to the extent that it could have had the line deenergized, the Supreme Court said: " 'One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for bodily harm to others, for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care. . . . The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.' (Rest., Torts, § 414.) Generally, the owner of property '. . . is under a duty to keep in safe condition all portions of premises over which he has control.' (*Sexton* v. *Brooks*, 39 Cal.2d 153, 156 [245 P.2d 496]) and in more detail: 'A possessor of land who knows, or reasonably should know, of a natural or artificial condition upon his premises which, he should foresee, exposes his business visitors to an unreasonable risk, and who has no basis for believing that they will dis-

cover the condition or realize the risk involved therein, is under a duty to exercise ordinary care either to make the condition reasonably safe for their use or to give a warning adequate to enable them to avoid the harm.' (*Crane* v. *Smith*, 23 Cal.2d 288, 296 [144 P.2d 356] ; see also Prosser on Torts, pp. 642 et seq.)'' (*Austin* v. *Riverside Portland Cement Co.*, 44 Cal.2d 225, 232-233 [282 P.2d 69].)

To the normal duties of an invitor, section 6400 of the Labor Code, where applicable, has added a statutory duty.[2] (*Atherley* v. *MacDonald, Young & Nelson, Inc.*, 142 Cal. App.2d 575, 580-581 [298 P.2d 700].) ██ As explained in *Johnson* v. *A. Schilling & Co.*, 170 Cal.App.2d 318, at page 322 [339 P.2d 139] : "Section 6302, Labor Code, defines 'place of employment' as 'any place, and the premises appurtenant thereto, where employment is carried on . . .' Section 6304 reads : ' "Employer" shall have the same meaning as in section 3300 and shall also include every person having direction, management, control, or custody of any employment, *place of employment,* or any employee.' (Emphasis ours.) This definition is obviously intended to enlarge the meaning of 'employer' beyond its usual meaning for the purposes of Division 5 of the Labor Code in which it is found and which deals specifically with 'Safety In Employment.' Where an owner of real property contracts to have work done on his property such property becomes a place 'where employment is carried on' and hence a place of employment under the definition of section 6302. Since the owner has 'custody and control' of his own property, he then has custody and control of a 'place of employment' and hence is an 'employer' within the definition of section 6304." (See also *Maia* v. *Security Lumber & Concrete Co.*, 160 Cal.App.2d 16, 20 [324 P.2d 657].)

██ In the light of the facts and the law as stated, we turn to an examination of specific contentions of the appellants. Complaint is made of the giving of several instructions relating to General Order Number 95 of the Public Utilities Commission of the State of California. That General Order embodies rules for overhead electric line construction. One of such instructions was as follows:

"Table 1 of Rule 37 of General Order 95 of the Public

---

[2]Section 6400 of the Labor Code is as follows: "Every employer shall furnish employment and a place of employment which are safe for the employees therein."

Utilities Commission of the State of California provides, in part, as follows:

"Vertical clearance above buildings and bridges or other structures which do not ordinarily support conductors and on which men can walk whether attached or unattached . . .

"For supply conductors and supply cables

"From 750 to 20,000 volts .................... 12 feet.

"Horizontal clearance of conductor from buildings (except generating and sub-stations), bridges or other structures (upon which men may work) where such conductor is not attached thereto ..................

"For supply conductors and supply cables

"From 750 to 20,000 volts .................. 6 feet."

We assume that General Order Number 95, where pertinent under the facts, may impose a duty upon the owners of structures as well as upon power companies. (See *Bickham* v. *Calif. Edison Co., supra,* 120 Cal.App.2d 815, 820.) The difficulty is that in the present case there was no evidence which would make applicable the provisions of the order contained in the quoted instruction. The sign was not a structure "on which men can walk." While it could be said to be a structure "upon which men may work," the evidence could not support any determination that with respect to the closest high-voltage wire the "horizontal clearance of conductor from" the sign was 6 feet or less. (*Cf. Perrine* v. *Pacific Gas & Elec. Co.,* 186 Cal.App.2d 442, 447 [9 Cal.Rptr. 45].) There was, accordingly, no basis for the further instruction to the jury that if a party to the action violated General Order Number 95, "a presumption arises that he was negligent." The giving of instructions with respect to the provisions of General Order Number 95 was clearly error. Whether such error was so prejudicial as to require a reversal of the judgment will be hereinafter discussed.

■ Error is also asserted in the giving of the following instruction: "On the subject of negligence, the standard of care is that one maintaining wires carrying electricity is required to exercise the care that a person of ordinary prudence would exercise under the circumstances. Among the circumstances are the well-known dangerous character of electricity and the inherent risk of injury to persons or property if it escapes; hence, the care used must be commensurate with and proportionate to that danger. Specific application of that standard requires that wires carrying electricity must be

carefully and properly guarded, insulated and protected, and warning given of the danger, by those maintaining them at all places where there is reasonable probability of injury to persons or property therefrom." That instruction is based upon the language of *Polk* v. *City of Los Angeles*, 26 Cal.2d 519, at page 525 [159 P.2d 931], quoted by the Supreme Court in *Dunn* v. *Pacific Gas & Elec. Co.*, 43 Cal.2d 265, at page 273 [272 P.2d 745], an action brought against a public utility operating an electric power line. The same language was quoted in *Austin* v. *Riverside Portland Cement Co., supra*, 44 Cal.2d 225, at pages 231-232, but in the Austin case it was noted that (p. 230) : "While, as stated, the line was owned by California, defendant could request and the request would be granted, to have the power shut off—the line deenergized." The evidence in the present case discloses no such authority or control over the line resting in either Federal or Union. The giving of such instruction constituted error since it did not bear upon any duty owed by either Federal or Union to the decedent and hence it was misleading.

▄▄▄ Both appellants assert that the trial court committed error in refusing to instruct the jury upon the subject of assumption of risk. However, appellant Federal is not in a position to urge that matter since it did not allege such a defense in its answer and the pretrial order does not show that that defense constituted an issue insofar as the liability of Federal was concerned. (*Florez* v. *Groom Development Co.*, 53 Cal.2d 347, 360 [348 P.2d 200] ; *Inouye* v. *Pacific Gas & Elec. Co.*, 53 Cal.2d 361, 367-368 [348 P.2d 208].)

▄▄▄ In the Inouye case, it was said, at page 368: "While it is true that it has been held that it is not necessarily error to instruct upon the unpleaded doctrine if contributory negligence has been pleaded (*Covely* v. *C.A.B. Construction Co.*, 110 Cal.App.2d 30 [242 P.2d 87]), it does not follow that it is error to refuse to instruct on the unraised issue."

▄▄▄ The defense of assumption of risk was raised by appellant Union. It is true that the jury should not be instructed upon that doctrine where the evidence shows a violation of a safety order such as General Order Number 95. This court said in *Bickham* v. *Southern Calif. Edison Co., supra*, 120 Cal.App.2d 815, at pages 823-824: "Appellant argues that the evidence conclusively proved that plaintiff assumed the risk of working in proximity to the wires, that he thereby acquiesced in the violation of the safety order and may not complain even though his injuries resulted proxi-

mately from the condition created by the violation. We cannot agree. Such a doctrine would place a premium upon the violation of laws enacted in the public interest. It would retard the growing trend of legislation to regulate dangerous activities in the interest of greater public safety. It was held in *Finnegan* v. *Royal Realty Co., supra,* 35 Cal.2d 409 [218 P.2d 17], that such violations of law may not be waived." (See also *Maia* v. *Security Lumber & Concrete Co., supra,* 160 Cal.App.2d 16, 20; *Atherley* v. *MacDonald, Young & Nelson, Inc., supra,* 142 Cal.App.2d 575, 587.) But the difficulty in the present case is that there was no evidence to show a violation of General Order Number 95. Consequently, the jury should have been instructed on the doctrine of assumption of risk. (*Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, 235.) ██ In the Austin case, the court said, at page 235: "The rule on assumption of risk was recently stated by this court. 'The defenses of assumption of risk and contributory negligence are based on different theories. Contributory negligence arises from a lack of due care. The defense of assumption of risk, on the other hand, will negative liability regardless of the fact that plaintiff may have acted with due care . . . . ██ It is available when there has been a voluntary acceptance of a risk and such acceptance, whether express or implied, has been made with knowledge and appreciation of the risk . . . . ██ Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge, and there may be an assumption of the risk, but where it merely appears that he should or could have discovered the danger by the exercise of ordinary care, the defense is contributory negligence and not assumption of risk.' (*Prescott* v. *Ralphs Grocery Co.,* 42 Cal.2d 158, 161-162 [265 P.2d 904].) . . . The evidence would have justified an instruction on assumption of risk; . . ." ██ However, in the present case the jury was instructed as follows (as part of an instruction requested by the plaintiffs) : "Whether or not it is negligence for one to proceed into a dangerous situation of which he had previous notice is a question of fact, not always and necessarily to be answered in the affirmative. *If at the time he was aware of the danger and also appreciated its extent, and if he voluntarily and unnecessarily exposed himself to it, then he was negligent as a matter of law.* But to forget a danger once known to exist, and to be in a state of abstraction or absent-mindedness or to err in judgment may or may

not be negligent depending on whether or not in the circumstances it shows a want of ordinary care. Also, the jury must consider the character of the notice received, whether recent or remote, and the impression such information would make upon the mind of an ordinarily prudent person in a like situation."[3] (Emphasis added.) That instruction was identical with an instruction given as an illustration by the court in *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, following the court's statement at page 236 that: "Indeed some of those instructions [which were given] sound like assumption of risk or at least gave the jury the elements thereof and told it that plaintiffs could not recover if those conditions existed. (See *Hayes* v. *Richfield Oil Corp., supra,* 38 Cal.2d 375, 385 [240 P.2d 580].)" For the same reason as that which was found to be sufficient by the Supreme Court

[3]Appellant Federal, relying upon *Lazzarotto* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 157 Cal.App.2d 455, 461 [321 P.2d 29], criticizes this instruction insofar as it bears upon the matter of momentary forgetfulness. It is asserted that for "an electrician to forget the presence of high-tension wires is as absurd as for a driver to forget to look for approaching vehicles in an intersection."

Reference is also made to another instruction which was in part to the effect that if the jury found that the decedent knew that high voltage lines were present and constituted a hazard, such a fact would not necessarily establish that he was contributively negligent, and that "[m]ere forgetfulness of a known danger will not bar recovery unless such forgetfulness constitutes negligence under the circumstances." An instruction in the words of the instruction last noted is set forth in *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, at pages 236-237. The Supreme Court said, at page 237: "As expressed in many cases, and recent ones, whether forgetfulness of a known danger constitutes contributory negligence is a question for the trier of fact, giving consideration to the circumstances even though there is no sudden disturbance or peril confronting the plaintiff and causing the lapse of memory; to forget is not negligence unless it shows a want of ordinary care. Generally the question is one for the jury. [Citations.]" In *Bickham* v. *Southern Calif. Edison Co., supra,* 120 Cal.App.2d 815, where the accident occurred in a manner similar to that in the present case, this court said, at page 823: "It is settled beyond question that if one has knowledge of the existence of a dangerous condition momentary forgetfulness of the danger does not amount to contributory negligence if there is reason to believe that he nevertheless acted with ordinary prudence and caution. (*Hayes* v. *Richfield Oil Corp.,* 38 Cal.2d 375, 385 [240 P.2d 580].) Each case rests upon its own facts. . . . In all of them [the cases relied upon by the appellant in the Bickham case] in which it was held that contributory negligence was established as a matter of law there was some element of disregard of or indifference to a known danger."

As to the assertion that "there was not one shred of evidence in this case that plaintiff [decedent] forgot the presence of the wires," it is sufficient to state that the jury was free to draw such inferences as were reasonable from the evidence relating to the circumstances of the accident. Appellant Federal's contention that there was error as to instructions relating to momentary forgetfulness cannot be sustained.

in the Austin case, the present appellants are not in a position to claim prejudicial error with respect to the rejection of requested instructions on the doctrine of assumption of risk. (See also *Inouye* v. *Pacific Gas & Elec. Co., supra,* 53 Cal.2d 361, 368.)

Both appellants argue that the decedent was guilty of contributory negligence as a matter of law. Reliance is placed on section 385 of the Penal Code which is in part as follows: "(b) Any person who either personally or through an employee or agent, or as an employee or agent of another, operates, places, erects or moves any tools, machinery, equipment, material, building or structure within six feet of a high voltage overhead conductor is guilty of a misdemeanor." The applicable law is stated in *Alarid* v. *Vanier,* 50 Cal.2d 617, at page 621 [327 P.2d 897]: "The presumption of negligence which arises from the violation of a statute is rebuttable and may be overcome by evidence of justification or excuse." It is further said at page 624 of that opinion: ". . . [T]he correct test is whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." What has heretofore been said herein upon the subject of momentary forgetfulness need not be here repeated. It cannot be said that the decedent was contributively negligent as a matter of law. (*Cf. Bickham* v. *Southern Calif. Edison Co., supra,* 120 Cal.App.2d 815, 822-823.)

The question remains as to whether the erroneously given instructions with respect to General Order Number 95 and as to the duties of one who has control over the maintenance of high-voltage lines compel a reversal of the judgment. "The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal depends on all the circumstances of the case, including the evidence and the other instructions given. No precise formula can be drawn." (*Butigan* v. *Yellow Cab Co.,* 49 Cal.2d 652, at 660-661 [320 P.2d 500]; see also *Alarid* v. *Vanier, supra,* 50 Cal.2d 617, 625.) Accordingly, we turn to an analysis of the evidence in support of the plaintiffs' case as against each defendant.

Insofar as Federal is concerned, it is obvious that a warning to the decedent of the presence of the wire with

which he came in contact would have served no purpose since that wire was in plain sight and its presence and nature were known to the decedent. The problem of liability is primarily that of whether the conditions that existed were safe for workmen engaged in making the proposed alterations on the sign. (See *Bickham* v. *Southern Calif. Edison Co., supra,* 120 Cal.App.2d 815, 819.) In the determination of that question, the triers of fact were necessarily concerned with what danger Federal should reasonably have anticipated in view of its knowledge of the situation of the sign and the nature of the alterations to be made. (See *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, 233.) With respect to that issue, the trier of fact could have found that the place of the work was safe and that the accident arose because of the negligent operation of the boom which Federal had no reason to anticipate. (See *Deorosan* v. *Haslett Warehouse Co.,* 165 Cal.App.2d 599, 618 [332 P.2d 422] ; *Perrine* v. *Pacific Gas & Elec. Co., supra,* 186 Cal.App.2d 442, 449.) Under such circumstances the instructions relating to General Order Number 95 and to the duties of a public utility maintaining high-voltage lines interjected false issues into the case and were highly prejudicial to appellant Federal. They could only serve to mislead and confuse the jury. A reversal of the judgment as to Federal cannot be avoided. (See *Butigan* v. *Yellow Cab. Co., supra,* 49 Cal.2d 652, 661.)

█ The sign was maintained by Federal under what was apparently an agreement in the nature of a license from Union. There was no evidence that Union knew that the sign was to be altered by the installation of neon lights and the addition of metal molding. It gave no permission for such work. The record does not show that Union had an office or kept any employee on the premises. None of its officers saw the work in progress. Even if a representative of Union had been near the sign on November 19, 1956, observation would have revealed the use of ladders in the work but not any operation of the boom. Trinajstich and the decedent arrived at the site of the sign about 9 a. m. on November 20, the day of the accident. They immediately set the boom, which was on their truck, into position so that the metal sections of molding could be raised into place. While the record does not disclose the exact time of the accident, the witness Ladhoff, a deputy sheriff, testified that he received his radio call to investigate the accident about midmorning. It thus appears

that the boom was actually in use for only a part of the morning. Insofar as Union is concerned, its position is similar to that of one of the defendants in *Hayden* v. *Paramount Productions, Inc.*, 33 Cal.App.2d 287 [91 P.2d 231], wherein the particular defendant had no knowledge of the use of cranes or the work in progress. (See *Austin* v. *Riverside Portland Cement Co., supra,* 44 Cal.2d 225, 234.) But if it be assumed purely for the purpose of argument that it could be found that Union had constructive notice of the work in progress and could have exercised control over such work and that there was a case to go to the jury as against it, it is obvious that the instructions which were prejudicial as to Federal were also prejudicial as to Union and require a reversal of the judgment as to it.

The judgment is reversed as to each appellant.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied April 24, 1961, and respondents' petition for a hearing by the Supreme Court was denied May 24, 1961.