[Civ. No. 10181. Third Dist. Mar. 8, 1962.]

JEFF WILLIAMS, Plaintiff and Respondent, v. DON LAMBERT, Defendant and Appellant.

McLaughlin & Russell for Defendant and Appellant.

Nathaniel S. Colley for Plaintiff and Respondent.

SPARKS, J. pro tem.*—Defendant appeals from a judgment awarding damages to plaintiff for personal injuries. The case was tried before a jury, and a verdict in which three-fourths of the jurors concurred was returned in favor of plaintiff. His damages were assessed in the sum of

*Assigned by Chairman of Judicial Council,

$33,366.10. Thereafter the trial court in lieu of granting a new trial ordered a reduction in the judgment to $25,000. Plaintiff consented in writing to the remittitur and the motion for new trial was denied. Prejudicial error alleged to have been committed by the trial court in instructing the jury is the sole ground for the appeal.

Plaintiff was a laborer employed by Jackson-Hopkins Company, general contractors engaged in the installation of a storm drainage system in Yolo County. He was injured in the course of his employment when he was struck by a section of large conduit pipe which had been lowered into the drainage ditch by a crane owned by defendant, Don Lambert. The action originally was brought against Sargent, the foreman, who had given the signals to the crane operator, and Don Lambert as codefendants. Subsequently, an amended complaint was filed naming Don Lambert, the crane owner, as sole defendant.

 Responsibility for the accident was charged against defendant on the ground of negligence in the operation of the crane and for his alleged failure to comply with a safety ordinance of the Division of Industrial Safety of this state. The following instruction informing the jury of the safety order and the effect of any violation thereof was given:

"You are instructed that at the time of the accident in question there was in effect a General Safety Order of the Division of Industrial Safety, State of California, which governed the operation of the crane in question. It reads as follows:

" '4004. Signaling. Only qualified employees shall give signals. No one should give signals except employees who are specifically designated and authorized to do so by the employer. Crane operators shall not accept signals except from those specifically designated and authorized to give the same.'

"*The Safety Order just read to you fixes a minimum standard of care, and any violation of it is negligence.*" (Emphasis added.)

Appellant contends that the instruction does not correctly state the law, and that it in effect took from the jury the determination of whether the violation of the safety order, if any they found, was a proximate cause of the accident, and also whether under the circumstances defendant's conduct was excusable or justified.

 Legally empowered and authorized public bodies may prescribe by regulation what constitutes proper conduct

of a reasonable person under particular situations. Conduct below the minimal standards of care thus established is often described as negligence per se, or negligence as a matter of law. (35 Cal.Jur.2d § 16, p. 502.) However, in California it is established that the standards imposed by statute or regulation are not inflexible under all situations, nor does proof of violation thereof conclusively establish negligence. (*Alarid* v. *Vanier*, 50 Cal.2d 617 [327 P.2d 897]; *Gallup* v. *Sparks-Mundo Engineering Co.*, 43 Cal.2d 1 [271 P.2d 34]; *Tossman* v. *Newman*, 37 Cal.2d 522 [233 P.2d 1]; *Kingery* v. *Southern Calif. Edison Co.*, 190 Cal.App.2d 625 [12 Cal.Rptr. 173]; *Saeter* v. *Harley Davidson Motor Co.*, 186 Cal.App.2d 248 [8 Cal.Rptr. 747]; *Servito* v. *Lynch & Sons Van & Storage Co.*, 191 Cal.App.2d 799 [13 Cal.Rptr. 313].) ▮ The more reasonable rule as expressed by Chief Justice Gibson speaking for the court in *Alarid, supra,* at page 621, is: "The presumption of negligence which arises from the violation of a statute is rebuttable and may be overcome by evidence of justification or excuse."

▮ Unless only one reasonable inference can be drawn from the evidence, the issue of whether the violation was under the circumstances excusable or justifiable is for the trier of fact. (*Figlia* v. *Wisner*, 150 Cal.App.2d 109 [309 P.2d 832]; *Taylor* v. *Jackson*, 123 Cal.App.2d 199 [266 P.2d 605]; *Smith* v. *City & County of San Francisco*, 117 Cal.App.2d 749 [256 P.2d 999]; *McDonald* v. *Foster Memorial Hospital*, 170 Cal.App.2d 85 [338 P.2d 607].) ▮▮ To be of consequence the violation of statute or of regulation must be shown to have proximately caused or contributed to the injury or damage complained of, which also is ordinarily a question of fact to be resolved by the trier thereof. (*Mawhiney* v. *Signal Trucking Co.*, 132 Cal.App.2d 809 [283 P.2d 27]; *Lopez* v. *Capitol Co.*, 141 Cal.App.2d 60 [296 P.2d 63]; *Hickenbottom* v. *Jeppesen*, 144 Cal.App.2d 115 [300 P.2d 689]; *Figlia* v. *Wisner, supra.*) ▮ In *Alarid, supra,* the Supreme Court in reviewing a number of instructions on the subject, including those contained in California Jury Instructions, Civil, No. 149 and No. 149.1, stated (p. 624): "In our opinion the correct test is whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desires to comply with the law." Language of

instructions inconsistent with the rule as announced was specifically disapproved.[1]

We are of the opinion that the instruction given to the jury in the instant case constituted error. The jury should have been instructed that the presumption of negligence which arises from the violation of a statute is rebuttable and may be overcome by evidence of justification or excuse. (*Alarid* v. *Vanier, supra; Kingery* v. *Southern Calif. Edison Co., supra.*) The failure to instruct correctly and fully on this subject must necessarily have excluded from the jury consideration of issues of fact which it alone had the prerogative and duty to determine.

To evaluate the probable effect of the erroneous instruction upon the verdict of the jury, and to determine whether or not it was prejudicial, it is necessary to examine the entire record, including the evidence. (*Bridgman* v. *Safeway Stores, Inc.*, 53 Cal.2d 443 [2 Cal.Rptr. 146, 348 P.2d 696] ; *Butigan* v. *Yellow Cab Co.*, 49 Cal.2d 652 [320 P.2d 500] ; *Nahhas* v. *Pacific Greyhound Lines*, 153 Cal.App..2d 91 [313 P.2d 886].) A consideration of the record discloses that plaintiff as an employee of the general contractor, Jackson-Hopkins Company, was working as a pipe layer in a ditch which had been excavated to a depth of from 12 to 18 feet. The conduit was constructed in sections measuring 6 feet in diameter and 6 feet in length. Each section of pipe weighed approximately 6 tons. Due to the size and weight of the pipe and the depth of the ditch it was necessary to employ a crane in lifting and in lowering the sections. The superintendent in charge of the project for Jackson-Hopkins Company and plaintiff's supervisor was one Oscar Sargent. Arrangements had been made

---

[1]California Jury Instruction No. 149 was thereafter revised to conform to the opinion in *Alarid* v. *Vanier*, to read as follows:

"If a party to this action violated . . . the [statute] [ordinance] [safety order] just read to you, a presumption arises that he was negligent. This presumption is not conclusive. It may be overcome by other evidence showing that under all the circumstances surrounding the event, the conduct in question was excusable or justifiable.

"To prove that a violation of a [statute] [ordinance] [safety order] such as that charged in this case was excusable or justifiable so as to overcome the presumption of negligence, the evidence must support a finding that the person who violated the [statute] [ordinance] [safety order] did what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting in similar circumstances."

Instruction No. 149-B reads: "However, in this action, a violation of law is of no consequence unless it was a proximate cause of [or contributed as a proximate cause to] an injury found by you to have been suffered by [the plaintiff] [one of the parties]."

by Sargent with defendant, Don Lambert, for the rental of the crane. The agreement was that defendant would furnish the crane, together with an operator and an oiler, for a stipulated hourly rental. It was the oiler's function to drive the equipment to the site of the work and to care for the machinery. It was also his job, when required, to relay signals to the operator. The latter was in charge of the crane and caused it to operate by engaging and disengaging the necessary levers. It was conceded that Vern Lambert, the operator of the crane, and Ray Hansen, the oiler, were employees of Don Lambert and were paid by him at all times. The court correctly instructed the jury that the crane operator was acting as agent for the defendant and within the scope of his authority at the time of the events out of which the injury to plaintiff occurred. The crane furnished by defendant was mounted upon the frame of a truck which was parked about 10 feet from the edge of the ditch in which plaintiff was working. Because of the depth of the excavation and of the position of the crane the operator could not see the workmen in the ditch. Movement of the sections of pipe by the crane was therefore accomplished by hand signals given to the operator who put his machine into action accordingly. The signals used in the operation were standard to the trade and understood by the construction workers. Signals were only to be given by and accepted from an authorized and designated person.

On the morning of the accident plaintiff had been detailed to move some supplies in a truck. In his absence another pipe layer by the name of Wakefield had laid three sections of pipe, which installation had been subsequently rejected by the inspector on the job, the alignment not being correct. The three sections were then removed and the process of relaying them begun. Plaintiff had returned and both he and Wakefield were in the ditch performing their duties as pipe layers. Sargent was in charge of the operation and rode down into the ditch on a section of the pipe being relaid. When this pipe had been lowered to the floor of the ditch, the boom of the crane was left attached to it. Plaintiff testified that he turned to secure an iron bar with which to release the ''T'' fastener of the boom. Sargent while standing on top of the pipe and with his arm and hand extended upward gave the crane operator a signal to lift the pipe slowly. As the pipe was raised from the ditch floor it rolled toward the bank and its pendulum-like motion pinned plaintiff against the wall of

the ditch. Plaintiff testified that he had not signaled for the pipe to be raised, had not observed anyone else giving signals to the crane operator, and had not expected the pipe to be raised at that time. Sargent testified that he had looked in the ditch before giving the signal and plaintiff was standing on the "upstream side"; that he turned and gave the signal to the crane operator; that the pipe moved and swung over against plaintiff who had stepped between it and the bank to get the bar. The record was clear that the crane operator could not see plaintiff or the other pipe layer in the ditch, and in raising or lowering the pipe he would have no knowledge of their whereabouts.

Plaintiff attempted to fix responsibility for the accident upon the owner of the crane for the manner in which the signal was accepted by the operator and the pipe caused to be moved. The following excerpts taken from the record illustrate sharp conflicts as to the proper method of signaling to the operator, and particularly as to who was authorized to give the signals.

We quote from plaintiff's testimony: "Q. Will you tell us again what your job was? You said it was a pipe layer. Tell me how you function in laying these pipes? A. A pipe layer, you give the signals, you tell them where—you motion for them to set the pipe in a ditch, lay in an eighteen foot deep ditch, fourteen feet wide. I can't see over it. . . . Q. You said something about signals. To whom did you give signals? A. I gave the signals to the oiler and he relayed them to the crane operator. Q. You would give signals to the oiler and the oiler gave signals to the operator? A. Yes. . . . Q. When the pipe came to the ditch what would you do? A. If I was ready to put a pipe in I would signal the oiler. If I wasn't ready I would signal to stop. Q. Was there any understanding or regulation about when the operator could lower the pipe or move it while you were in the ditch? A. He wasn't supposed to move at no time unless I signaled. Q. Did you signal the operator directly or was the oiler supposed to relay the signal? A. The oiler was supposed to be at the ditch. The operator could not see me."

We quote from the testimony of Oscar Sargent: "Q. In the month of July, 1957 you were in the process of laying this pipeline? A. Yes. Q. You have already told us Mr. Williams was one of Jackson-Hopkins' employees? A. Yes. Q. Working under your direction and control? A. Yes. Q. Now, did you on any occasion, sir, give signals to the crane operator?

A. Yes, I would say that I gave three-fourths of them to him. Q. And were you authorized and directed by your employer to be able to give those signals by Jackson-Hopkins Company? A. I am as superintendent of the job, I am in full charge of it and I carry an operating engineer's card that authorizes me to and I designate myself to give signals. . . . Q. Can you give us some idea of the number of pipes that had been actually laid that morning prior to the time Mr. Williams was injured? A. We averaged about 250 feet a day six feet joints. That would be about 40 joints. There should have been about twenty joints in the ditch. Q. Approximately twenty by late that morning? A. Yes. Q. Were you present when those twenty were laid? A. Like I say, I can't remember whether I was present for all of the time but I am reasonably sure I was present when eighteen of them was [sic] laid. Q. At least eighteen? A. Yes. Q. When those eighteen were laid could you tell us who would give the signals to the crane operator? A. Either I would or I would relay them to the oiler or give them to him verbally and he would relay them on to the operator. . . . Q. Now, at the time of this accident where were you? A. I was in the ditch standing on the pipe giving signals to the operator.''

We quote from defendant's testimony: ''Q. So far as you were concerned and your instructions to your crane operator were concerned the crane operator could take any instructions from anybody on the job who gave them to him? A. Yes. I didn't instruct him otherwise. Q. You didn't give him any instruction or designate who would be the signal giver? A. No. That was Jackson-Hopkins' part of the job. Q. Are you telling us you delegated to Jackson-Hopkins Company the responsibility of determining who would give signals. A. Yes. All they did from me was rent the crane with operator and oiler fully operated and maintained to do their work as they saw fit and they did the work the way they wanted.''

We quote from the testimony of Vern Lambert: ''Q. Mr. Lambert, when you were operating from a position where you could not see men down in the hole the practice was that somebody at the scene would relay signals to the oiler and the oiler would relay signals to you; is that right? A. Yes, we take signals from the oiler when we can't see and if nobody higher up is around to oversee it. Q. And who determines whether a signalman is necessary? A. The operator if he can't see he has got to have his oiler out where he can see him. Q. On this day you could not see, could you? A. No. Q. So

you had the oiler out to signal you, didn't you? A. Yes. Q. But at the time Mr. Williams got hurt the oiler wasn't there? A. No, but Mr. Sargent was. Q. Was the oiler there? A. No. Q. Had the oiler told you he was leaving? A. No. Q. He just walked off? A. Yes. Q. Mr. Sargent was there. He was down in the ditch but not on the bank? A. Yes. . . . Q. Now, at the time of this accident just before the accident happened you had moved the crane, hadn't you, sir? A. Yes. Q. At whose direction did you move the crane? A. At Oscar Sargent's. Q. Now, had Mr. Sargent given you signals prior to the time of this accident? A. Yes. Q. Could you give us an estimate of the number of times he had signaled you while working on this job? A. Several times.''

From the foregoing it clearly appears that there were serious conflicts in the testimony not only as to the manner in which the signal should be given but also as to how the accident happened and the proximate cause thereof. We are convinced that the evidence was reasonably susceptible of different conclusions on the question of negligence and proximate cause, or even on contributory negligence, if the jury accepted Sargent's testimony that the accident could have been ''helped'' if plaintiff ''had stayed where he belonged instead of jumping between the pipe and the ditch.'' Undoubtedly the jury could have concluded that the proximate cause of the accident was the failure of Sargent to ascertain with certainty that the pipe could be moved in safety before giving the signal to the crane operator. However, it is not our function to determine issues of fact nor to resolve conflicts in the testimony. The sole purpose of our examination of the record is to ascertain whether or not the error in instructing the jury was prejudicial and probably led to the verdict reached. We do not determine where the preponderance lies. (*People* v. *Watson*, 46 Cal.2d 818 [299 P.2d 243] ; *People* v. *Salaz*, 66 Cal.App. 173 [225 P. 777] ; *People* v. *Abbott*, 132 Cal.App. 109 [22 P.2d 566] ; *Hirshfeld* v. *Dana*, 193 Cal. 142 [223 P. 451].)

As the result of our examination of the entire record we have reached the conclusion that the erroneous instruction given to the jury was prejudicial. The jury was instructed that violation of the safety order was negligence. From this instruction the jury could well have concluded that it was required as a matter of law to find the defendant guilty of negligence solely because his crane operator had accepted a signal from the superintendent, Sargent, instead

of from the oiler. That the jury did so appears reasonably probable from the record, since it was contended that the safety order placed upon defendant, rather than the general contractor, the responsibility of designating the persons who should *give* the signals. Under the instruction the jury was not permitted to try the issue of facts as to whether or not the crane operator's conduct was excusable or justifiable under the circumstances, or whether in accepting the signals from the superintendent in charge of construction he did what a person of ordinary prudence who desired to comply with the law might reasonably be expected to do under similar circumstances. And, as we have noted, although the jury was instructed generally on the law of proximate cause, it was not specifically informed that a violation of the regulation in question was of no consequence unless it was a proximate cause or contributed as a proximate cause to the accident.

Respondent urges that irrespective of the effect of the instruction there was independent evidence of negligence on the part of defendant sufficient to support the verdict. In addition to the circumstance of the operator accepting the signal from Sargent when the oiler had left his post, it is contended that the operator responded too quickly to the "hoist slow" signal, and that it was negligence for him to have taken the signal when he could not see the full figure of the man giving it—only his hand. However, examination of the record does not disclose that the operator could not see the signal given, nor that he interpreted it erroneously by giving the "boom up" or "fast movement" rather than the "hoist slow."

Whenever the evidence is sharply conflicting, it is impossible to say that the jury disregarded an erroneous instruction. We quote from a recent decision of the Supreme Court: ". . . Where it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict.' (*Oettinger* v. *Stewart,* 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221]; also *Miller* v. *Peters,* 37 Cal.2d 89, 95 [230 P.2d 803].) The fact that only the bare number of jurors required to reach a verdict agreed upon the verdict for defendants lends further support to the probability that the erroneous instruction was the factor which tipped the scales in defendants' favor." (*Robinson* v. *Cable,* 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

A miscarriage of justice within the meaning of section 4½ of article VI of the Constitution occurs in a cause, and which justifies a reversal of the judgment thereof, when it appears reasonably probable that were it not for the error a result more favorable to the appellant could have been obtained. (*People* v. *Watson, supra*; and *Butigan* v. *Yellow Cab Co., supra.*) In view of the whole record we do not believe that this is a case within the saving provision of the Constitution.

The judgment is reversed.

Peek, P. J., and Schottky, J., concurred.

A petition for a rehearing was denied April 4, 1962, and respondent's petition for a hearing by the Supreme Court was denied May 2, 1962. Peters, J., was of the opinion that the petition should be granted.