[Civ. No. 37837. First Dist., Div. Two. Mar. 29, 1977.]

ALYSON CLARK, Plaintiff and Appellant, v.
WILLIAM A. LAUGHLIN, Defendant and Appellant,
SHIRL S. FOX, Defendant and Respondent.

## COUNSEL

Crist, Crist, Griffiths, Bryant & Schulz, Robert E. Schulz and Patricia J. Gebala for Plaintiff and Appellant.

Mead & Bradley, John S. Mead, Robert A. Seligson and Patrick A. Nielson for Defendant and Appellant and for Defendant and Respondent.

## OPINION

**TAYLOR, P. J.**—Defendant, William A. Laughlin (hereafter Dr. Laughlin), an orthodontist, appeals[1] from an adverse judgment entered on a jury verdict in an action for malpractice. His major contention on appeal is that the trial court's comments on a portion of the evidence exceeded the permissible perimeters of article VI, section 10 of the state Constitution and therefore constituted prejudicial error. We disagree and affirm the judgment.

Viewing the record most strongly in favor of the judgment and verdict, as we must, the following pertinent facts appear:

In 1966, the patient, Alyson Clark (hereafter Ms. Clark) was 12 years old and taken to an orthodontist, Dr. Bartlett, after a referral by the family dentist, Dr. McFate. Dr. Bartlett diagnosed her condition as an extreme class 2 malocclusion[2] and began the treatment with the attachment of two bands and a lingual arch on the lower teeth and a banding of the upper first molars with 24-hour headgear. These were all in place before Dr. Laughlin was chosen to take over Dr. Bartlett's practice, following the latter's death in an airplane crash in 1967.

---

[1] The patient also cross-appealed from the judgment on the verdict in favor of Dr. Fox.

[2] Occlusion refers to the way the lower teeth meet with the upper teeth and centric occlusion is the way they are most commonly found in chewing food; malocclusion is a term used to describe an unsatisfactory position. The class 2 diagnosis indicates that the molars and the cuspids of the upper arch are forward of the molars and cuspids of the lower arch; class 1 is a normal and desired occlusion.

When Dr. Laughlin took over the case and before he began to treat Ms. Clark, he examined the record that Dr. Bartlett had compiled earlier. However, he did not take any new X-rays or make and mount diagnostic models of her mouth, the most commonly used diagnostic tools among orthodontists.

There was substantial evidence that an orthodontist practicing with the same degree of care and skill as other orthodontists in the community would make his own independent diagnosis and not rely on the diagnosis of another physician. Dr. McFate indicated that it is not good practice to rely on the diagnosis of a doctor who formerly treated the patient. Dr. Laughlin's expert, Dr. Snyder, testified that according to customary standards of good practice, he would make his own diagnosis of a transfer patient, although it might be possible to take over a transfer case without rediagnosing it if the former orthodontist used the same type of technique and treatment. Dr. Laughlin, however, indicated that each orthodontist has a different practice and treats differently and in different sequences. In fact, Dr. Laughlin had deviated from the treatment plan outlined by Dr. Bartlett. In January 1968, Dr. Laughlin placed a complete set of bands on the upper teeth; the lower teeth were never banded.

In October 1968, Ms. Clark first noticed a problem with the opening and closing of her jaw, subsequently diagnosed as a temporal mandibular joint problem[3] (hereafter TMJ problem). Several weeks later, she noticed that the TMJ problem had become permanent and she was able to open her jaw only about one inch without manipulation. On her first visit after the initial episode, she mentioned the matter to Dr. Laughlin. He made no mention of the cause of the problem, did not prescribe any treatment or recommend that she see another dentist after Ms. Clark still complained in June 1969. He did not do so even though at the time she first mentioned the matter, he was not certain of the cause of her TMJ problem, and did not feel capable or competent of treating it; also, he had not had any experience with such a severe TMJ problem. In September 1969 after her 15th birthday, Dr. Laughlin asked Ms. Clark to consult Dr. Karna and to make an appointment to see him. Ms. Clark attempted to do so, but Dr. Karna's receptionist refused to give her an appointment. Ms. Clark immediately told her mother and also told Dr. Laughlin on her next visit. Dr. Laughlin did not believe that Ms. Clark had been unable to make an appointment with Dr. Karna. However, he

---

[3]This is the joint directly in front of the ear where the mandible or jawbone hinges to the skull.

made no comment, never again asked Ms. Clark to see Dr. Karna or anyone else and did not discuss the TMJ problem, his inability to treat it, or Dr. Karna with her mother.[4]

The symptoms of Ms. Clark's TMJ problem continued and worsened during the remainder of treatment with Dr. Laughlin. When her bands were removed in August 1972, Dr. Laughlin concluded that she was in a good class 1 occlusion and had reached the treatment objective.

Ms. Clark, however, still had soreness in her jaw and difficulties with opening her mouth and chewing, as well as a considerable "slide." On the recommendation of Dr. Haas, an orthopedist, she was referred to another orthodontist, Dr. Fox. Dr. Fox examined Ms. Clark's teeth but took no impressions. At the initial visit where Mrs. Clark was present, Dr. Fox outlined a course of treatment to correct the TMJ problem so that Ms. Clark's mouth would open again. On several subsequent visits, Dr. Fox ground and polished Ms. Clark's teeth and her occlusion temporarily improved. Dr. Fox consulted with Dr. Laughlin during his treatment of Ms. Clark. Although he knew that grinding was an irrevocable procedure that removed enamel, he believed it would resolve Ms. Clark's problems. Other evidence indicated that while Dr. Fox ground Ms. Clark's teeth in spots through the enamel and into the dentin, he did not alleviate the symptoms of her TMJ problem. Dr. Takamoto opined that her malocclusion was so severe that no amount of grinding short of grinding away nearly her entire tooth, could have resolved her problem. Dr. Laughlin was alerted about these treatments by Dr. Fox and was aware that the TMJ problem persisted.

In December 1972, when Ms. Clark was home on vacation from college, she saw Dr. McFate and complained about the continuing problem with her jaw. Dr. McFate's examination disclosed substantial orthodontic problems that were causing the TMJ problem and that the enamel had been ground away down into the dentin. Dr. McFate called

---

[4]Dr. Laughlin testified that he did discuss the need for further treatment with Mrs. Clark in April 1972, and she was against any further treatment because of the expense involved. However, his records did not show such a conversation, although he had recorded other meetings with Mrs. Clark. Mrs. Clark denied it; the uncontroverted evidence indicated that cost was never a problem. All of the dentists and orthodontists involved found Ms. Clark and her mother cooperative and conscientious in pursuing treatment.

Mrs. Clark and discussed the need for further orthodontic work to correct the TMJ problem.

At this time, for the first time, Mrs. Clark connected her daughter's jaw problem with the orthodontic work. Mrs. Clark subsequently selected Dr. Takamoto from a list of two provided by Dr. McFate. Dr. Takamoto and Dr. McFate both opined that Ms. Clark's TMJ syndrome was caused by Dr. Laughlin's treatment. Dr. Laughlin's expert, Dr. Snyder, opined that Ms. Clark's transitory TMJ problem was not caused or exaggerated by Dr. Laughlin's treatment which had not deviated from the normal standard of care by an orthodontist. Dr. Snyder indicated that TMJ problems and the symptoms of malocclusion could be, but were not necessarily related: TMJ problems are common; many are transitory and caused by factors unrelated to orthodontic treatment, such as tension or tongue thrusting, and can be adjusted by slight equilibration or grinding.

Dr. Snyder, however, also testified that it was a negligent deviation from the accepted standard of care in the community to treat a case which you are not capable of treating. He also indicated the standard of care among orthodontists in the community was to inform patients if a serious problem existed. Dr. McFate indicated that it was not the standard of practice in the area to refer young patients to other dentists without discussing the reference with a parent, or informing the parent of the referral in writing.

When Ms. Clark first saw Dr. Takamoto, her present orthodontist, in December 1972, after some five years of orthodontic treatment, she still had a class 2 malocclusion. Dr. Takamoto and Dr. McFate both opined that Ms. Clark was in class 2 malocclusion throughout her orthodontic treatment; that she never improved from that condition.[5] The experts of both parties, however, agreed that if Ms. Clark had been properly treated, she would have attained proper occlusion and proper function of her jaw.

---

[5] Dr. Laughlin and his expert opined that by the time the bands were removed, Ms. Clark had a class 1 occlusion, but that she relapsed. However, there was no reference anywhere in Dr. Laughlin's chart to a relapse except for a problem with a single tooth and testimony was offered tending to prove that if class 1 occlusion had in fact been attained, such a severe relapse would not have occurred.

■ The major contention on appeal concerns the trial court's following comment on the evidence: "I understand Dr. Laughlin's testimony to be that he did not feel he could properly treat the problem existing around October or November 1968. He gave a card or something similar to the pf telling her to see Dr. Karna.

"He later spoke to the mother concerning Dr. Karna but was informed by her that she had engaged Dr. Bartlett and, later, Dr. Laughlin to treat her daughter and wanted Dr. Laughlin to continue the treatment. He did not inform the mother of his concern of his own ability to properly treat this particular problem of the pf.

"I feel it was his duty and the good standard of practice as defined in these instructions to inform the mother of his concern. The failure to do so, in my opinion, is negligence.

"I have no comment of the question of proximate cause nor the nature and extent of damages in connection with this thought. Nor do I intend any comment on the credibility of any witness." The record indicates that immediately after the above comment, the jury was given BAJI No. 15.21, set forth below.[6]

Dr. Laughlin argues that by the above quoted comment, the trial court exceeded the permissible perimeters of his power to comment on the evidence (state Const., art. VI, § 10) and committed prejudicial error. He asserts that the comment improperly invaded the fact-finding function of the jury by focusing on one aspect of the case.

---

[6]"I have not intended by anything I have said or done, or by any questions that I may have asked, to intimate or suggest how you should decide any questions of fact submitted to you.

"If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion.

"At this time, however, and for the purpose of assisting you in properly deciding this case, I am permitted by the Constitution of California to comment on the evidence and the testimony and credibility of any witness.

"My comments are intended to be advisory only and are not binding on you as you must be the exclusive judges of the questions of fact submitted to you and of the credibility of the witnesses.

"You may disregard any or all of my comments if they do not coincide with your views of the evidence and the credibility of the witnesses."

It will be noted that the court properly instructed the jury that its comment on the evidence was advisory only and could be disregarded if it did not coincide with the jury's view of the evidence and credibility of the witnesses.

The elements of Ms. Clark's action against Dr. Laughlin were a legal duty to use due care, a breach of that duty, proximate cause, and damages (*Evans* v. *Ohanesian,* 39 Cal.App.3d 121, 129 [112 Cal.Rptr. 236]). The trial court carefully indicated that it was not commenting on the crucial issues of proximate cause, damages or credibility; its comment was confined to one of several possible aspects of Dr. Laughlin's duty and breach. ■ Even in a criminal case, a trial court may comment on the evidence as long as it does not withdraw material evidence from the jury, distort the testimony, or interfere with the jury's exclusive function of determining conflicting questions of fact and the credibility of witnesses (*People* v. *Rincon-Pineda,* 14 Cal.3d 864, 866 [123 Cal.Rptr. 119, 538 P.2d 247]; *People* v. *Brock,* 66 Cal.2d 645, 654 [58 Cal.Rptr. 321, 426 P.2d 889]). ■ It follows that in a civil case, like the instant one, its powers are even broader (*Keim* v. *D. B. Berelson & Co.,* 105 Cal.App.2d 154, 158 [233 P.2d 123]). We hold, therefore, that the court may express an opinion on negligence if, under the facts, the comment is appropriate and fair. As in the instant case, it may comment on a portion of the testimony and need not sum up all of the evidence, both favorable and unfavorable (*Pomerantz* v. *Bryan Motors, Inc.,* 92 Cal.App.2d 114, 119-120 [206 P.2d 440]).

■ As is not uncommon in cases of malpractice, the evidence on each of the essential elements of Dr. Laughlin's liability was in sharp conflict. There was, however, ample substantial evidence to indicate that Dr. Laughlin's treatment deviated from the customary standards in several respects. First, he did not make his own independent diagnosis after taking Ms. Clark as a transfer patient, but relied on Dr. Bartlett's. Second, he did not inform Ms. Clark's mother about his own concern as to his inability to treat the TMJ problem that mystified him from its initial occurrence, severity and persistence, in such a young patient. He also did not follow up the referral to Dr. Karna or inform Mrs. Clark of the need for further treatment until 1972, about the time that the bands were removed. The 1972 conversation, at best, however, merely indicated the need for further treatment and did not apprise Mrs. Clark of Dr. Laughlin's doubts about his own ability to cope with TMJ problems, and that he wanted someone more capable and experienced with TMJ

problems to handle it. We conclude that the court's comment was a fair summary of Dr. Laughlin's own testimony on the subject and was not an erroneous comment on the weight of the evidence (*Van Fleet* v. *Heyler*, 51 Cal.App.2d 719 [125 P.2d 586]). Dr. Laughlin's expert, Dr. Snyder, indicated that the customary standard of care was to inform patients if a serious problem existed. There was also testimony concerning the community practice of following through on the referrals of young patients to other dentists by an oral or written discussion of the reference with a parent.

In addition, there was ample substantial evidence to indicate that during the four years that Dr. Laughlin treated Ms. Clark he failed to achieve the desired orthodontic result of a class 1 occlusion. Some of the experts indicated that Ms. Clark's TMJ syndrome was caused by Dr. Laughlin's orthodontic treatment. The experts on both sides agreed that the proper treatment of Ms. Clark would have resulted in a proper occlusion and the elimination of her TMJ problem. At the same time, the jury heard the extensive evidence concerning the conflicting views of orthodontists as to what constituted a proper occlusion, the different approaches to treatment, and that TMJ problems were frequently transitory and could be handled by equilibration.

Viewing the trial court's careful comment in the light of the entire record (in excess of 700 pages) and the inferences to be drawn therefrom, we can only conclude that the jury properly functioned as the sole and exclusive judge of the facts and returned a verdict that was its own (cf. *People* v. *Ottey*, 5 Cal.2d 714, 730 [56 P.2d 193]). Even assuming, without conceding, that the trial court's comment was improper where, as here, there is such a preponderance of substantial evidence to support the verdict, no miscarriage of justice or reversible error occurred (*Williams* v. *Lambert*, 201 Cal.App.2d 115 [19 Cal.Rptr. 728]; *People* v. *Watson*, 46 Cal.2d 818 [299 P.2d 243]). In view of our conclusion, it is not necessary to reach the issues on the cross-appeal pertaining to Dr. Fox.

The judgment is affirmed. Clark to recover costs from Laughlin on appeal. Fox to recover costs from Clark on the cross-appeal.

Kane, J., and Rouse, J., concurred.