[Civ. No. 10019. Third Dist. June 1, 1962.]

LORENE MARTIN et al., Plaintiffs and Appellants, v. PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

Boccardo, Blum, Lull, Niland & Teerlink, Edward J. Niland and Bruce Werlhof for Plaintiffs and Appellants.

Richard H. Peterson, R. A. Raftery, Noel Kelly, Gilbert L. Harrick and Robert C. Schiffner for Defendant and Respondent.

PIERCE, J.—This is an appeal from a judgment entered on a jury verdict for defendant in a wrongful death action. Two deaths are involved and there are two separate groups of plaintiffs-appellants.

One group is the heirs of Luster Martin, deceased (herein-

after called Martin, Jr.); the other, the heirs of Timothy Martin, deceased (Martin, Sr.). On May 17, 1958, Martin, Jr., was rearranging a television antenna installed on the ridge of the home of his father located in a wooded area of Nevada County, near the City of Grass Valley. While so engaged a guy wire suspended from the top of the antenna pole, the lower end of which Martin, Jr., was apparently carrying in an attempt to secure it to some object affixed to the ground, came in contact with one of the wire-conductors of a high-tension (12,000 volt) power line maintained by respondent. There were no witnesses to the accident, but Martin, Jr.'s sister (Mrs. Noland) was nearby and, hearing a ''terrific pop,'' rushed around the house to find her brother lying on the ground. She was thrown back by an electric charge when she attempted to reach him and accordingly tried to restrain Martin, Sr., when he rushed to the scene. He threw her aside, however, grabbing the smoking guy wire from his son's body and was electrocuted. The antenna guy wire had become welded to one of the lower wires of the overhead line upon contact and had charged it with electricity. After the accident Martin, Sr.'s body was on the ground, on or near a path some 20 feet southeast of the south corner of the house and his son was approximately 10 feet farther away—as evidenced by the burned areas of grass found where the two men were lying respectively and shown on a diagram. (Plaintiffs' Exhibit No. 3.) Martin, Sr., had let loose of the guy wire as he fell to the ground and it was noted, still charged, about a foot or 14 inches to the east of his body in a bush. Martin, Sr., was killed instantly. Martin, Jr., was removed to a hospital where he died nine days after the accident of toxemia due to third-degree burns. A further statement of the facts will become involved in discussion of the points raised on appeal.

Appellants make no direct challenge to the sufficiency of the evidence. Five points are raised on appeal.

1. *Re The Contention That the Trial Court's Instructions on the Issue of Liability Were Argumentative and Favored Respondent.*

The first contention is that a number of instructions given by the court on the issue of liability were ''worded in a negative and highly argumentative form.'' (It is not pointed out that any of these instructions misstate the law.) It is unnecessary to restate at length all of the instructions to which exception is taken. We find none of them argumenta-

tive. Instructions, necessarily negative in form, if taken from context, frequently seem to overstate the position of one party to the prejudice of the other. When read in context, however, the apparent overemphasis fades. That is the case here. For example, the first instruction objected to relates to General Order No. 95 of the California Public Utilities Commission regulating the minimum requirements for high-tension lines and states that the order does not require insulation of wires. This instruction, however, was preceded by instructions given by the court which stated affirmatively what the regulation in question *does* require. The judge, moreover, gave an instruction requested by plaintiffs that the provisions of the general order were not intended as complete provisions for high-voltage conductors, but that such conductors should be built and kept according to accepted good practice for general local conditions under all the circumstances.

Next appellants object to an instruction which stated correctly that power-line utilities are not required to anticipate at their peril every possible situation in which persons may injuriously or fatally contact their wires and were not insurers; that they were not required to insulate wires if such wires were placed at a distance above property where their current would not interfere with normal and proper uses of the property. They also object to two instructions which they ungently stigmatize as "perniciously argumentative." These instructions declare that " 'Courts will not prescribe standards in respect to such matters' [in the selection of facilities, equipment and appliances] and questions of engineering standards could be determined for the defendant itself through those who were expert and experienced in the field" (so long as ordinary care be used)—that negligence cannot be found merely because untested, unproved and speculative experiments are not used; that the mere fact that an electrical transmission business is accompanied by hazards does not in and of itself show negligence and that if the defendant exercised ordinary care in the operations in question and was not negligent it was not liable. The jury was also given instructions (at the request of plaintiffs), however, which we believe accurately and fully informed the jury affirmatively regarding the duties and obligations of the respondent as a power company maintaining and operating a high-voltage line. These instructions will be considered in connection with a point raised by appellants and discussed hereinafter.

■ One questioned instruction, after sufficiently instructing the jury that it must find both negligence and proximate cause, goes on to add, "in other words, even if you find that Pacific Gas and Electric Company was negligent in some way, you still may not render a verdict against the company unless you also find that the negligence of the company proximately caused the accident here." The added portion of this instruction was repetitive, unnecessary, and properly subject to the criticism of overemphasizing defendant's position. A too frequent repetition by the judge of instances in which a defendant is not liable (or in which a plaintiff is entitled to recover) is likely to indicate to the jury that judicial favoritism is being expressed. Happily, submission by counsel of these "formula" instructions, prevalent in an earlier generation, is being discouraged. (BAJI, p. 18.) The pace and magnitude of jury trials require that trial judges rely more and more upon instructions submitted by counsel, who from their longer and closer familiarity with the legal issues of the particular case are peculiarly in a position to aid proper jury instruction, if in so doing they are mindful that the attorney's obligation in submitting instructions is to subordinate his role as advocate to his obligations as an officer of the court.

■ Final responsibility, of course, must remain in the trial judge to refrain from giving instructions which are "slanted." ■ On the other hand, it must be recognized that statements of abstract principles of law will frequently be unintelligible to a jury unless related to facts in evidence as such facts apply to one party or the other and such party's rights and liabilities. Considerable latitude must be given; too critical analysis should not be made or too rigid rules asserted at the appellate court level, to interfere with an honest effort by trial judges to give meaning by illustration to their charges to the jury.

■ With this in mind we hold that the instructions objected to were certainly not "perniciously argumentative." We cannot say that they overemphasized respondent's position to any point of impropriety. (In fact a reading of the instructions as a whole shows a conscientious effort by the learned trial judge to be fair and impartial.) With the one exception noted, we do not disapprove of any of the instructions complained of under this category.

■ An adjunct of the first point made by appellants on appeal is their objection to the refusal of the court to give

their proposed instruction declaring that a power "company must use the highest degree of care." They concede that the applicable *standard* of conduct of a defendant power company is exercise of *ordinary* care. (*McCormick* v. *Great Western Power Co.*, 214 Cal. 658, 663-664 [8 P.2d 145, 81 A.L.R. 678].) But they argue that "the *quantum* of care required of an electric power company is greater than that required of the ordinary defendant, and the jury should have been specifically instructed on this rule."

The latest expression by the California Supreme Court of the rule for which appellants contend is in *Borenkraut* v. *Whitten,* 56 Cal.2d 538 [15 Cal.Rptr. 635, 364 P.2d 467], where the alleged negligence was a service station operator's conduct while using gasoline under circumstances where it was likely to ignite. Plaintiff requested an instruction to the effect that because of the great danger involved in pouring gasoline in an open carburetor a person in ordinary prudence will (and it is his duty to) exercise extreme caution when engaged in such an activity. The court (per Mr. Justice Peters) held that it was prejudicial error to refuse this instruction.

Here, however, the court *did* instruct the jury *inter alia* (on the subject under discussion): "Inasmuch as the amount of caution used by the ordinarily prudent person varies in direct proportion to the danger known to be involved in his undertaking, it follows that in the exercise of ordinary care, the amount of caution required will vary in accordance with the nature of the act and the surrounding circumstances. To put the matter in another way the amount of caution required by the law increases as does the danger that reasonably should be apprehended."[1]

The court also instructed: "Because of the danger involved in wires and devices through and by which electricity is carried, handled and used, the exercise of ordinary care by those charged with the maintenance of such equipment requires cautionary conduct as follows: . . . That generally an amount of caution be used which will be reasonably commensurate with the problem of protecting others from the existing danger."[2]

The court also gave the following special instruction offered by plaintiffs:

---

[1]This quoted portion of an instruction is a part of BAJI 102-A, all of which was given by the court.

[2]This quoted portion of an instruction is a part of BAJI 102-E, all of which was given by the court.

## "INSTRUCTION No. 21

"The duty of care imposed by the law on a power company is commensurate with and proportionate to the reasonably foreseeable consequences of its acts and omissions and extends to protect any person who might, with reasonable anticipation, be endangered by faulty or improper electrical equipment or installations. If the negligent act or omission is one which the company, in the exercise of ordinary care, should have expected was likely to result in injury to others, it is liable for injury or death proximately resulting therefrom and it is no defense that the precise accident or the particular injury was not anticipated, if an ordinarily prudent person similarly situated should have anticipated it."

These instructions satisfy the rule expressed in *Borenkraut* v. *Whitten, supra.*

2. *Re The Contention That the Trial Court was Guilty of Prejudicial Misconduct.*

 This contention, the last point made by appellants in their briefs, can be more logically discussed out of order of statement. Setting forth thirteen instances to which they take exception, appellants say: "Perhaps no one of the occurrences . . . standing alone, would have prejudiced the plaintiffs in this case. But, taken as a whole, they constituted a pattern of conduct which must have led the jurors to feel that the Court was hostile to the plaintiffs' case." We have read carefully *and in context* not only the portions of the transcript cited, but also we have studied the entire transcript and we think that appellants confuse hostility to the plaintiffs' case with what we consider to be pardonable judicial displeasure with the conduct of appellants' counsel. The "pattern of conduct" of appellants' counsel was keynoted at the outset of the trial where one of them sought to convert the opening statement into a medium of bias-incitement by apprising the jury sarcastically that defendant power company was "an *illustrious* public utility . . . one of the biggest in the nation, *guarantees its profits no matter how much it spends in the field for safety.*" Objection was made, counsel was warned by the court not to argue his case and in the very next sentence counsel talked about "this one little scene of utter stark tragedy"; and shortly thereafter accused defendant of "creating this death trap" (this phrase was used more than once) whose power line was "like a cobra waiting to strike." More than 45 minutes were spent in an opening statement

which, had it been restricted to facts to be proven, should not have required one-third that time.

Early during the trial the court admonished counsel on both sides (during the jury's absence) to refrain from "side comments. I have never appreciated them and I don't appreciate them now." This admonition went completely unheeded throughout the trial. Colloquy between counsel patently intended for the jury's ear was the rule; objections actually addressed to (and intended for) the court were the exception. Appellants' counsel were not the sole, but were the prime, offenders. On one occasion, in an objection by appellants, purportedly to the court, counsel so far forgot whom he was addressing as to assert: "I would like to remind Mr. Raftery [attorney for respondent] that in his opening statement to *you jurors* he told . . . etc." In the cross examination of a witness for respondent, one of appellants' counsel commented: "Maybe the script has been changed a bit, Mr. Meyers." Thinly veiled insinuations that respondent's witnesses were giving perjured testimony, the perjury suborned by respondent's counsel, were not isolated. At one point, after a particularly acerbic attack, respondent's attorney asked for and obtained a recess and in chambers moved for a mistrial. It was denied. In the opinion of this court, granting of the motion would not have been unjustified.

These few instances, typical of an atmosphere created by appellants' counsel all during the trial, illustrate a course of conduct too sustained to be accidental. One reads pages and pages of the transcript wholly given over to acrimonious debate so that the trial of a case, the issues of which were not complex and which, it was originally estimated, could be accomplished in two or three days, stretched out over more than a week with a transcript of 728 pages. Judges are human and such tactics are most irritating to a judge heedful of his obligation to expedite the course of the trial. Yet a painstaking review of the whole record convinces us that the learned trial judge exhibited a patience that few jurists would have found possible under the circumstances. We find no merit in appellants' contentions. We ask: "Why beholdest thou the mote that is in thy brother's eye but perceivest not the beam that is in thine own eye?"

3. *Re The Contention That the Trial Court Improperly Instructed on the Doctrine of Assumption of Risk.*

Appellants' second contention of error in order of its statement in their briefs is that the trial court erred by giving

any instruction on the doctrine of assumption of risk applicable either to the case of the heirs of Martin, Jr., or of Martin, Sr., and that even assuming the doctrine applicable, two of the instructions given were inaccurate.

The proposition that no instruction on assumption of risk should have been given rests upon appellants' not entirely objective review of the evidence, with no inferences whatever resolved in favor of the prevailing respondent. Our obligation is to view the evidence otherwise.

Here not only is there evidence (1) that Martin, Jr., knew of the existence of the plainly visible high-voltage wire and power line and (2) that he voluntarily undertook to manipulate a television-antenna guy wire in close proximity thereto —but such evidence is very convincing.

Order No. 95 of the Public Utilities Commission referred to above, in rule 52.4, subdivision A, provides that cross-arms of poles carrying high voltage conductors shall either be painted yellow or in lieu thereof shall contain ''signs showing the words 'HIGH VOLTAGE' . . . in letters not less than 3 inches in height . . . white on a green or black background.'' The exhibits in evidence show that this rule was complied with. That Martin, Jr., either was aware of the signs or was otherwise aware of the high-voltage character of the wires is evidenced by the fact that during a lucid period in the hospital, after the accident, he told his wife that ''he couldn't have come in contact with that wire because he was watching and being careful.'' Appellants argue that there is no evidence that Martin knew that the wire was uninsulated but it appears in evidence that use of uninsulated conductors in lines of this type, particularly in rural areas, is the usual practice of power companies; in fact it may be said to be a matter of common knowledge. The jury, therefore, could justifiably infer that Martin, Jr.'s statement to his wife was an acknowledgment of awareness of the dangerous factors involved.

As to his assumption of the risks involved, the following evidence is to be noted: The diagram and photographs in evidence show the power line in question running over and past the area here involved in a general easterly and westerly direction. The Martin home is a rectangle, the corners of which are roughly at the compass points, the front facing the southwest with the ground line of the side of the house forming an angle of approximately 40 degrees with the power line (projected vertically to the ground). This power line does

not pass over the ridge of the roof but overlays a small triangular segment of the south corner of the house. According to defendant's evidence and the diagram in evidence the vertical distance from the closest wire-conductor of the power line to the roof of the house at the point of least vertical clearance is 17.36 feet, while the vertical distance from this wire to the ground at the point of contact of the guy wire with the power line wire is 25.85 feet from the ground. It is true that these measurements were made two days after the accident and after the line had been repaired, but defendant's evidence was that the repaired line was a shade lower than the line at the time of the accident. (General Order No. 95 in this regard requires a minimum vertical clearance of 25 feet above the ground and a minimum vertical clearance of 12 feet above a building.) The antenna pole which Martin, Jr., was adjusting was located at the roof peak of the back of the house (the point farthest away from the power line—being some 20 feet distant therefrom). Three guy wires were suspended from the top of this pole, apparently having been loosened to permit a rotation of the antenna. Mrs. Noland, the sister, had turned on the television set in the house while Martin, Jr., manipulated the antenna to ascertain the direction of best reception. Shirley Martin, his 14-year-old daughter, assisting in the operation, had been directed to and did secure the guy wire, later to become an instrument in the fatal accident, to a 20-inch cedar tree located at a point 30 feet almost due south of the south corner of the house. Having adjusted the antenna, Martin, Jr., left the roof of the house and apparently unfastened the guy wire temporarily attached to the cedar tree and set about the location of a spot and object for permanent anchorage. Located approximately 10 feet southeasterly from the south corner of the house is a butane tank. Immediately beyond this a mass of lilac bushes reaches a height of 8.5 feet. South and westerly of these bushes is the path beyond which the terrain slopes upward. Appellants' theory of how the accident happened is expressed in counsel's opening statement, as follows: "We will show you that what happened in this case primarily was that Luster Martin realized that there were high tension wires so that he walked backward with that line taut, he was paying attention to those wires . . . he was fully aware that he was a long distance from those wires but as a matter of fact . . . the two wires got in close enough proximity with each other that they . . . arced." And later, in opening argument counsel stated:

"Near the house is a butane tank. You know that that tank has to be serviced by means of a truck. . . . I am sure that what Woodie [Martin, Jr.] had in mind was giving this line sufficient clearance so that his father could drive . . . the truck . . . in there. I am sure that Woodie was walking up the hill backwards with that line in his hand, sideways, determining which would be the best place to put it. . . ."

These conjectures are reasonable. Another possibility would seem to be that as Martin, Jr., carried the wire up the hill it became caught in the lilac bushes and that as he sought to disengage it the whipping motion brought the guy wire in contact with the wire of the power line. Or a too vigorous pulling on the taut guy wire may have caused it to break at or below its end connected with the antenna mast, snapping it into the power line. All theories are speculative. One thing is certain; in some manner Martin, Jr., managed to bring the guy wire at least within arcing distance (one inch) of the power-line wire-conductor.

█ The defense of assumption of risk is available when there has been a voluntary acceptance of a risk, express or implied, with knowledge and appreciation of that risk. (Rest., Torts, § 893, p. 491; Prosser on Torts (2d ed.) § 55, p. 303; *Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 384 [240 P.2d 580]; *Prescott* v. *Ralphs Grocery Co.*, 42 Cal.2d 158, 161-162 [265 P.2d 904].) The facts above related bring the case within the application of this rule.

The argument that Martin, Jr., had a legal right to be where he was, doing what he was doing, is predicated upon some theory that respondent was a trespasser in maintaining the power line at its established location. The question of title was neither pleaded nor referred to on pretrial. It was sought to be interjected at the trial and objection thereto was properly sustained. The argument has no merit. Respondent had a right of way and Martin, Jr., effectually interfered with its legal exercise if he voluntarily acted to bring the guy wire into the immediate vicinity of the power line. Whether he did so or not was a question of fact for the jury's determination. (*Williams* v. *Pacific Gas & Elec. Co.*, 181 Cal.App.2d 691 [5 Cal.Rptr. 585].)

Appellants also argue that the violation by respondent of a safety order was an issue in the case and therefore it was improper for the court to instruct the jury on assumption of risk without also instructing that the doctrine is not applicable if the jury should find defendant had violated an

applicable safety order. (*Williams* v. *Pacific Gas & Elec. Co.,* *supra,* at .p. 705.) In the first place, appellants are vague as to the precise violation claimed. Reference is made to poles which were out of plumb and cross-arms not set at right angles to the poles; and to an incorrect survey followed by a corrected one, evidenced by the diagram, Plaintiffs' Exhibit No. 3. Vertical clearance measurements, however, were made by transit, and so far as height above ground is concerned, did not depend upon the position of poles or cross-arms. All vertical clearance distances complied with the safety order. Reference to horizontal clearance requirements (for the first time on appeal) has no relevancy.

There was no direct evidence here of any violation of the safety order. The burden was upon plaintiffs to establish such violation. Where no direct evidence of violation of a statute or safety order is in evidence it is proper to instruct on assumption of risk without the qualification urged by appellants. (See *Gallegos* v. *Nash, San Francisco,* 137 Cal. App.2d 14 [289 P.2d 835].)

Appellants, moreover, requested no qualifying instruction. The trial court need not of its own motion give special instructions in the absence of a request therefor by counsel. (*Ornales* v. *Wigger,* 35 Cal.2d 474, 479 [218 P.2d 531].) (This, of course, is not to say that the omission from an instruction of an essential component part is thus excused.) (See *Williams* v. *Lambert,* 201 Cal.App.2d 115 [19 Cal.Rptr. 728].) That is not the situation here.

The same waiver applies with reference to the contention that the doctrine of assumption of risk would have been inapplicable to the case of the heirs of Timothy Martin, Sr., if the jury found he had taken steps reasonably necessary to protect his imperiled son, Luster, and if he did not act with unwarranted recklessness. The court did instruct the jury that one thus unrecklessly acting is not guilty of *contributory negligence* and gave this instruction at appellants' request. If they desired that the instruction be specially enlarged to include assumption of risk they should have requested it. The court, moreover, *did* instruct the jury that for the doctrine of assumption of risk to apply: "First, the person in question must have actual knowledge of the danger. Second, he or she must have freedom of choice. This freedom of choice must come from circumstances that provide him or her a reasonable opportunity, without violating any legal or moral

duty, to safely refuse to expose himself or herself to the danger in question." (BAJI, No. 207-B.)

Appellants also object to the giving by the court of BAJI Instruction No. 207-A, which, after noting a distinction between the type of assumption of risk which bars recovery and "the ordinary acceptance of common risks," elaborates on the latter by saying: ". . . [A] person will not be barred .from recovery for damage by the fact, if it be a fact, that while he is exercising ordinary care, and when nothing exists in the circumstances that either cautions him, *or would caution a reasonably prudent person in like position,* to the contrary, he assumes that others will perform their duties toward him and acts on that assumption." In the dissenting opinion of Mr. Justice Traynor in *Vasquez* v. *Alameda,* 49 Cal.2d 674 [321 P.2d 1], at p. 681, this instruction was condemned as erroneously suggesting "that if *in the exercise of due care* the plaintiff would have known of the danger of the defendant's negligence, he has assumed the risk of such conduct." (Emphasis added.) The majority opinion in that case does not dispute Justice Traynor's opinion that the giving of the instruction was error. It does, however, hold that neither this instruction, standing alone nor combined with other instructions, given in error, was prejudicial under the circumstances there presented. Similarly, we do not deem the instruction prejudicial here for reasons which will be stated hereinafter.

4. *Re The Contention of Error in the Court's Refusal to Give an Offered Instruction Excusing Plaintiffs' Statutory Violation.*

The next point appellants argue is that the trial court committed prejudicial error in refusing an instruction requested by them relating to Penal Code section 385. This section provides that any person who moves any tools, machinery or equipment or material within 6 feet of a high-voltage overhead conductor is guilty of a misdemeanor. At respondent's request, this statute had been quoted and the jury was instructed that a violation of the statute created an inconclusive presumption which, however, could be overcome by circumstances showing "the conduct in question was excusable, justifiable and such as might reasonably have been expected from a person of ordinary prudence." The instruction offered by plaintiffs, refusal of which is criticized, is as follows: "The violation, if any, of the provisions of Section

385 of the Penal Code of the State of California by Mr. Luster Martin does not constitute contributory negligence unless you find from a preponderance of the evidence (1) a knowledge on his part of the facts which bring this provision into operation and (2) an intentional act on his part in violation thereof. Mr. Luster Martin was presumed to be innocent of a crime and he is further presumed to have exercised ordinary care.''

The instruction is erroneous, since inferentially it shifts the burden to defendant to prove that a violation of the statute is inexcusable. Actually the burden is upon the violator of the statute to balance the presumption by a showing that violation was excusable. (*Alarid* v. *Vanier*, 50 Cal.2d 617, 622, 624 [327 P.2d 897].) The meaning of the instruction is also obscure in its use of the words ''an intentional act on his part in violation thereof.'' What intentional acts? Does the instruction mean there must be an intent to violate the statute or an intent to do the act which constitutes the violation? It is susceptible to the former interpretation and, therefore, was improper and properly refused.

5. *Re Appellants' Contention That it Was Error to Instruct That a Power Line Is an Obvious Peril.*

Appellants' next point is that it was error for the court to give the following instruction: ''You are instructed that one who knowingly and wilfully places himself or herself in the way of an obvious and well understood peril *such as an electric power line* is guilty of contributory negligence which bars recovery for his injury or death. Therefore, if you find that the plaintiff conducted himself as above set forth, then you must return a verdict in favor of defendant.'' (Emphasis added.)

This instruction was taken by respondent from the court's opinion in *Andrews* v. *Valley Ice Co.*, 167 Cal. 11, 21 [138 P. 699], and its use here illustrates the danger in the indiscriminate lifting from context of a portion of a court opinion for use as a jury instruction. In that case a worker on a building under construction, acting against the express warning and orders of his foreman, became electrocuted while measuring with a steel tape the distance from the wall of the building to a high-tension power line. In reversing a plaintiff verdict and holding the decedent guilty of contributory negligence as a matter of law the Supreme Court, after stating that the facts of the case did not bring it within the rule of

''excusable forgetfulness,'' then used the language borrowed by the instruction criticized above, but used it without the italicized phrase ''such as an electric power line'' which respondent added to the instruction in submitting it to the trial court here. As used in the opinion of the court in the *Andrews* case, the statement is an accurate statement of a well-settled rule. As used here, the phrase, ''places himself . . . in the way of,'' entirely clear in the context of the Andrews case, is ambiguous. Appellants argue that the question of whether or not this power line was ''an obvious'' peril was a question of fact for the jury, which the trial court, by insertion of the phrase objected to, removed from their determination. We think that use of the indefinite article ''a'' in the phrase ''such as *a* power line'' may save the literal accuracy of the statement; but that the jury could well have understood the instruction to be the judge's finding that this particular power line *was* an obvious peril. We are of the opinion, therefore, that the giving of the instruction without qualification was error.[3]

The court, however, also—and immediately thereafter—gave an instruction (BAJI No. 103-A) as proposed by appellants which states *inter alia* that whether or not it is negligence for one to proceed into a dangerous situation of which he had previous notice is a question of fact; that if he was aware of the danger and appreciated its extent, and voluntarily and unnecessarily exposed himself to it, he was negligent as a matter of law; but that to forget a once known danger or to be in a state of abstraction, etc., may or may not be negligent depending upon whether the circumstances showed a want of ordinary care; also that the character of the notice and its impression upon the mind of an ordinarily prudent person in like situation must be considered.

Considering the charge to the jury on this subject as a whole, the criticized instruction loses much of its potential to mislead.

We turn now to the question of prejudice. In the foregoing discussion we have noted and found three instances of misdirection of the jury, none of which, when considered in the light of the entire charge, appears to have had a possible

[3]The court, in the instruction next following that under discussion, gave the standard instruction, BAJI No. 140, generally referred to as the ''to look is to see'' instruction. Appellants object thereto. This instruction, however, was approved by the Supreme Court as recently as October 1961, in *Daun* v. *Truax*, 56 Cal.2d 647, 651 [16 Cal.Rptr. 351, 365 P.2d 407]. *We find no error in its use under the facts of this case.*

bearing upon the outcome of the case. Section 4½ of article VI of the Constitution commands appellate courts not to set aside judgments on the ground of jury misdirection "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." This admonition cannot be reduced to formula. Each particular case must be studied, weighing the error found in connection with all circumstances present. (*Bridgman* v. *Safeway Stores, Inc.*, 53 Cal.2d 443 [348 P.2d 696].)

The length of our foregoing discussion does not measure the merit of plaintiffs' cause nor signify any belief by this court that the case was a close one. It indicates only our recognition that both arguments ably briefed and advocacy skilfully presented deserve commensurate consideration. The plaintiffs' claims, when appraised from a point of observation limited to the written record, are unimpressive. That they also lacked *ad hominem* appeal, notwithstanding emotions naturally evoked by both the tragedy and heroism depicted, seems implicit in the fact that the jury, similarly unimpressed, returned with a defense verdict after 20 minutes of deliberation. (A poll of the jury showed it 10 to 2.)

In the review of the evidence hereinabove stated we find little to sustain a charge of negligence against defendant power company, whose high-tension power line here was maintained not only as such power lines are commonly maintained, but also in strict compliance with the standards fixed by the public utilities commission. Negligence on the part of Martin, Jr., in the manipulation of the guy wire was apparently gross. Martin, Sr.'s bravely impetuous behavior was understandable but foolhardy in the extreme.

We hold that the misdirections of the jury found did not result in a miscarriage of justice.

The judgment is affirmed.

Peek, P. J., and Schottky, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 25, 1962. Dooling, J.,* participated in place of Traynor, J.

---

*Assigned by Chairman of Judicial Council.