[Civ. No. 10724.   Third Dist.   June 22, 1964.]

ROBERT JOSEPH HOWARTH, Plaintiff and Respondent, v. FRED KIRK MARONEY et al., Defendants and Appellants.

Ware & Kutz, Peckham & Peckham and Robert B. Kutz for Defendants and Appellants.

Grayson Price, Robert E. Burness, Jr., and Alvin M. Cibula for Plaintiff and Respondent.

PIERCE, P. J.—Plaintiff Howarth sued defendant Maroney, as driver, and defendant Algirina Pate, as owner, for personal injuries and property damages after a collision of automobiles. Defendants cross-complained for their injuries. They appeal from the judgment following a jury's verdict in plaintiff's favor.

Collision occurred while Maroney was executing a left turn across U.S. 99-E in front of Howarth's northbound automobile. Contentions on appeal are that the trial court prejudicially erred in giving inaccurate ad lib additions and interpolations to accurate BAJI instructions on (1) the duty of a left-turning driver to yield tue right of way, and (2) on the doctrine of last clear chance.

Our holding is that inconsequential misstatement occurred in the trial judge's choice of illustrative language and in the recounting of several details of testimony. Malapropos a discussion of the doctrine of last clear chance, there was a slip-of-the-tongue confusion of the parties' names. Any error was nonprejudicial.

Because we find some error, our obligation is to determine whether justice has miscarried. (Cal. Const., art. VI, § 4½.) In making that determination we must, to some extent, weigh the evidence. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; *Aldabe* v. *Aldabe,* 209 Cal.App.2d 453, 457 [26 Cal.Rptr. 208]; 3 Witkin, Cal. Procedure, Appeal, § 100, p. 2269.)

The accident was at an intersection and happened after dark on March 11, 1961. Howarth, alone, was northbound on U.S. 99-E which, at the point of collision, had four 12-foot lanes, the north and south lanes being divided. At the southerly outskirts of Chico, U.S. 99-E intersects with a highway called "the Skyway." It leaves U.S. 99-E at a 51-

degree angle. Maroney was driving, with Mrs. Pate and her daughter riding beside him. They had been southbound on 99-E. He had turned into a left-turn lane at the intersection, had stopped and had then turned left through traffic islands at the intersection and across northbound U.S. 99-E purposing to enter the Skyway. Howarth, approaching, was in the outside northbound lane. The two cars collided at the intersection. The right front of the Howarth car struck the right side of the Maroney car at its rear end.

The intersection was well lighted. There was no other traffic in the vicinity. The weather was clear and visibility was good.

First accounts of how the accident happened were given by the participants to highway patrol officers.

''Driver one [Howarth] stated he was northbound on U.S. 99E in . . . the righthand lane. Stated he saw the southbound car but throught it was going south. Couldn't say whether Vehicle 2 [Maroney] stopped at intersection. Saw lights swing into the northbound . . . [lane] in front of him, stated he applied his brakes and swerved to the left. Stated he would have missed Vehicle 2 except Vehicle 2 applied brakes at the last moment.''

Maroney was interviewed in the hospital and gave the officer his version of the accident:

''He stated he had been southbound on 99E in the left turn lane, stopped at stop sign and signalled for left turn; stated he saw northbound car, but misjudged its distance. Said he crossed—started to cross northbound lanes of 99E, suddenly saw northbound car was too close, stated he applied his brakes just before the collision.''

Howarth, testifying, placed his speed at between 55 and 60 miles per hour as he approached the intersection. Permissible posted speed was then 65 miles per hour. He observed the lights of the Maroney car. It was then ''back a ways'' from the intersection. When Howarth first saw its lights he dimmed his own lights. At this time some 600 feet separated the two cars. He noted nothing indicative of Maroney's intention to turn left until he, Howarth, was 170 feet from the intersection. Then Maroney suddenly started to cross in front of him. Howarth testified that when this occurred, ''I jammed my brakes on and slid approximately forty-two feet, and I hit the other vehicle approximately in the center line there, and my car after the impact pulled over to the righthand lane here, and I stopped right at the island here (indi-

cating)." He said he was traveling "less than 50 miles per hour" at the time of impact and could not judge his speed more accurately. He also testified: " . . . it happened so fast that I see he wasn't going to stop, so I swerved to the left. I was in the righthand lane, coming to the intersection, and so I swerved to the left to keep from hitting him, because if I had stayed in the righthand lane, I would have hit him in the front end, but I figured by going to the left I could prevent from hitting him. . . ." The right front of the Howarth vehicle struck the right rear of the Maroney car.

Both Maroney and Mrs. Pate testified that when they first saw the lights of the approaching Howarth vehicle, 2½ to 3 blocks separated the two cars. This was after Maroney had stopped preparatory to his left turn. Maroney testified:

"Q. Now, when you started to pull out and stepped on the accelerator, did you take a last look down the highway? A. Yes sir, I did, because I saw the car. Q. And that is when he was in all, three blocks or so, at least, down in the line here. A. Yes. Q. And what lane was Howarth in at that time? A. He was in the east northbound lane." Maroney also testified that as he came up to the stop sign he didn't know but imagined he was talking to Mrs. Pate. No impression was formed and no estimate given regarding the speed of the Howarth car except as estimated from the force of impact. Based upon that force he expressed an opinion that Howarth had been driving in excess of 65 miles per hour when he had first observed Howarth's car. Maroney fixed the speed of his own car at 12 miles per hour. He denied he had told the officer he had misjudged the distance away of Howarth's car; denied also that he had told the officer he had applied his brakes before the impact.

The highway patrol officer from indications on the pavement gave an opinion that the point of impact was in the easterly portion of the right-hand northbound lane and he noted that the skidmarks of the Howarth vehicle commenced at, and not back from, the point where he fixed the impact point. Measured length of skidmarks was 48 feet. He testified he could not state where Howarth had first applied his brakes. He said: "We know that there is a lag time, and the brakes don't lock up the second they are applied." He also expressed an opinion that the Howarth car had swerved to the left before the collision. His testimony in this regard (and in other respects) was somewhat equivocal. The officer expressed an opinion, the basis of which is not clear to us

from the evidence, that the speed of the Howarth car immediately after impact was from 30 to 35 miles per hour.

As is not unusual, it is impossible to correlate the testimony of the several witnesses so that the actual facts emerge with clarity. Obviously Maroney and Mrs. Pate, already starting across the highway at 12 miles per hour, and having a distance of not more than 50 feet to traverse in clearing it, did not correctly estimate the distance then separating their car from Howarth's when they stated it was from 2½ to 3 blocks away. On the contrary, since (at 12 m.p.h.) the Maroney car would have crossed the highway in slightly less than two seconds, Howarth's car (at the speed limit of 65 miles per hour) would only have been 180 feet back from the point of impact when Maroney started to cross. (This accords closely with Howarth's testimony that the separating distance was 170 feet.)

Accuracy of Howarth's statement of the point where his brakes were first applied and the officer's opinion as to the point of impact on the pavement would both seem subject to serious doubt. Our reading of the record leaves us with some conviction that the statements given by the participants to the officer after the accident more closely approximate actuality than their subsequent testimony. It seems evident that Maroney simply misjudged the distance separating his car from Howarth's oncoming vehicle and the speed (not necessarily exceeding the legal limit) at which the latter was traveling. This obviously is what the jury believed and we do not think its deliberations were substantially affected by anything the court stated during the giving of instructions. We now consider these objected-to statements.

When, in instructing the jury, the judge reached the subject of the obligations of a driver intending to turn left at an intersection, he first read Vehicle Code section 21801[1] imposing a duty upon such driver to yield the right-of-way to all vehicles approaching the intersection which are "so

---

[1]Vehicle Code section 21801 reads:

"(a) The driver of a vehicle intending to turn to the left at an intersection shall yield the right-of-way to any vehicle which has approached or is approaching the intersection from the opposite direction and which is so close as to constitute a hazard at any time during the turning movement.

"(b) A driver having so yielded and having given a signal when and as required by this code may turn left and the drivers of all other vehicles approaching the intersection from said opposite direction shall yield the right-of-way."

close as to constitute a hazard'' and ''until such time as the left turn can be made with reasonable safety'' and including (in subsection (b)) the obligation of other vehicles approaching from the opposite direction then to yield the right-of-way to him.

The judge then proceeded to extemporize: ''That latter section, (b), ladies and gentlemen, arose, as you will note, after the driver has yielded the right-of-way to a vehicle that is close enough to constitute a hazard. That section exists in order to prevent the situation where if you approach a boulevardway stop and have a car that is three-quarters of a block or so at least, coming as a hazard, and another one coming, and another one and another one, the first one will have the right-of-way; but if at the time you have made your stop there is a vehicle in back of that first vehicle that is the hazard, that is far enough away so that he is not an immediate hazard, you don't have to wait forever to clear the— to cross the intersection, you see. You do have to give the right-of-way to those vehicles that are close enough to constitute a hazard. That may be one, two or three vehicles; but it may be that only the first vehicle would be the hazard, the second one might be far enough away so that you would have a right to go. You don't have to stop until the intersection is clear for two miles either way, you see.''

Appellants contend that by the judge's interpolation, and because Mr. Howarth's car was the only other car approaching from the opposite direction, the jury was being informed that Mr. Howarth had the right-of-way as a matter of law. We do not think so. The section itself assumes a situation in which a driver intending to turn left may be confronted with more than one vehicle approaching from an opposite direction and the judge simply made the same (obviously academic) assumption. Fairly construed, the judge's statement told the jury only that the right-of-way must be yielded to any and all approaching cars close enough to constitute a hazard, but that any vehicle farther back must yield the right-of-way. This correctly states the law.

█  Also complained of is a statement by the court, answering a juror's request when the jury was about to retire for deliberation. The judge was asked to read again his instructions regarding ''degrees of negligence.'' The judge, correctly construing the question to relate to instructions given on the law of contributory negligence, pointed out the distinction between ''contributory negligence'' and ''com-

parative negligence.'' Appellants concede the law in this regard was accurately explained. As a part of the explanation, however, the judge gave an illustration, saying: ''It might appear to a person that both parties have been negligent. You are not to say, well, it is far more reckless, it is far more negligent, to make a left turn across a highway than it is to—well I don't know what plaintiff's negligence would have consisted of except perhaps speed—than to drive down the highway at an excessive rate of speed. You are not to compare negligence. . . .'' Appellants' contention is that this effectually told the jury the only possible negligence on the part of Mr. Howarth would be excessive speed.

The judge's illustration given was perhaps unartfully worded but we find no harm in it to appellants' cause. It is difficult to conceive any theory of negligence by Howarth which could have contributed proximately to the accident other than excessive speed, and appellants in their brief do not suggest another theory.

Moreover, we consider that any error possibly committed by either of the judge's statements objected to was cured by admonition. After the jury had deliberated about 45 minutes, it was recalled by the judge (apparently at the request of counsel) who then instructed the jury that although in California a judge is permitted to comment upon the evidence ''I did not intend to make any such comment at any stage of this case, and whenever I referred to any possible fact finding, it was with reference to a particular instruction, and the comment was made only to clarify the meaning of that instruction. If any of you gathered the impression from any of my remarks that I had an opinion concerning negligence or contributory negligence, I would instruct you to disregard that inference. . . .'' Counsel interprets this as compounding error. He insists this statement effectually told the jury that the judge, during the course of the instructions, had only stated matters of law. Reasonably interpreted, we do not consider the judge's admonition is susceptible to the construction placed upon it by appellants. The judge was merely attempting to tell the jury that factual comments by him had been for illustrative purposes only and were without significance as indicating the court's appraisal of the actual proof. We think the jury could not have misunderstood the import of the judge's words. Incidentally, the court at the outset of the reading of instructions had also admonished the jury: ''I have not intended by anything I

have said or done or by any questions that I may have asked to intimate or suggest what you should find to be the facts, or that I believe or disbelieve any witness who may have testified, and if anything that I have done or said has seemed to so indicate, you will disregard that intimation and form your own opinion as to the facts without regard thereto.''

■ Appellants' last contention of error relates to the court's instructions on the doctrine of last clear chance. Instruction on this doctrine was given at the request of the appellants. Apparently, this request was made upon the theory that under the facts of the case some possible application of the doctrine could be made in appellants' favor in their status as cross-complainants and to excuse any assumed contributory negligence on their part.

In giving the instruction requested, otherwise correct (if applicable), the judge used two illustrations. In one, while discussing the conflict in the evidence relating to the distance which separated the two vehicles, he said: ''This instruction would be applicable only if you found the distance to be somewhere between the— well, it would have to be more than a hundred and seventy feet that Mrs. Pate gave as her estimate at the time they were crossing the center line, and would also have to be less, I suppose, than the two and a half blocks Mr. Maroney gave.'' The judge also stated at another point during the instruction: ''In other words, this doctrine would be inapplicable if you believe on the evidence that the plaintiff did not see Mr. Howarth [*sic*] going into his left turn, as has been argued to you.''

Mrs. Pate had not testified that the distance separating the cars when the turn was made was 170 feet. That had been Howarth's testimony. Maroney's testimony, as stated above, had fixed the separating distance at ''three blocks or so, at least.'' In the judge's latter statement quoted above, he had gotten the parties reversed.

The contentions of the respective parties had been so clearly stated and frequently reiterated, both in evidence and by the arguments of counsel, that we deem it quite unlikely that the jury was confused regarding the facts because of the judge's inadvertent slips-of-the-tongue. As to the meaning of the doctrine of last clear chance, however, undoubtedly it *was* confused.

But any contention that this confusion was prejudicial presupposes either that accurate statement of the doctrine of last clear chance (given, as stated, at appellants' behest and

for their benefit) belonged in the case or that the misstatement in some other respect disadvantaged appellants. Neither presupposition can be sustained.

In 1957 definitive treatment of the doctrine of last clear chance was given by our Supreme Court (per Justice Spence) in *Brandelius* v. *City & County of San Francisco,* 47 Cal.2d 729 [306 P.2d 432], where it is stated (on p. 743) : ''The formula may be restated as follows: The doctrine of last clear chance may be invoked if, and only if, the trier of the facts finds from the evidence: (1) that the plaintiff was in a position of danger and, by his own negligence, became unable to escape from such position by the use of ordinary care, either because it became physically impossible for him to escape or because he was totally unaware of the danger; (2) that defendant knew that plaintiff was in a position of danger and further knew, or in the exercise of ordinary care should have known, that plaintiff was unable to escape therefrom; and (3) that thereafter defendant had the last clear chance to avoid the accident by the exercise of ordinary care but failed to exercise such last clear chance, and the accident occurred as a proximate result of such failure.''

(This formula was quoted with approval and applied in *Hildebrand* v. *Los Angeles Junction Ry. Co.,* 53 Cal.2d 826, 830 [350 P.2d 65].)

In Brandelius the ''time element'' is stressed as being vital to the application of the doctrine. As is stated by Justice Spence (on p. 741) a defendant's ''knowledge of the injured person's position of danger may substantially precede'' his knowledge of the latter's inability to escape ''but defendant is not liable under the doctrine unless after the time that he is chargeable with the required knowledge of the injured person's inability to escape, he 'has the last clear chance to avoid the accident by exercising ordinary care.' '' It is in respect to the time element that the facts here clearly fail in making a ''last clear chance'' case.

The last clear chance doctrine assumes that the party invoking it has *negligently* placed himself in a position of danger. But Maroney's negligence here could only have been a failure to yield the right of way to Howarth's approaching car *so close as to constitute a hazard.* Therefore the very assumption of Maroney's negligence carries with it by necessary inclusion the refutation of any last clear chance by Howarth, with knowledge of Maroney's predicament, thereafter to avoid the accident.

■ Considered as a whole, appellants' contentions seem to be a criticism of the judge's conscientious efforts to give his instructions to the jury on abstract principles of law greater clarity by example. We perceive no vice in the giving by a court of illustrations which make its instructions on the law to a jury more meaningful. On the contrary, in *Martin* v. *Pacific Gas & Elec. Co.*, 204 Cal.App.2d 316, we stated (on p. 322 [22 Cal.Rptr. 291]) : " . . . [I]t must be recognized that statements of abstract principles of law will frequently be unintelligible to a jury unless related to facts in evidence as such facts apply to one party or the other and such party's rights and liabilities. Considerable latitude must be given; too critical analysis should not be made or too rigid rules asserted at the appellate court level, to interfere with an honest effort by trial judges to give meaning by illustration to their charges to the jury."

■ However, the giving by the court of *oral* instructions extemporaneously improvised has been criticized. In *Martin* v. *Los Angeles Turf Club, Inc.*, 39 Cal.App.2d 338, the court, per Justice McComb, observed (on p. 343 [103 P.2d 188]) : "A number of appeals have come to our attention where errors in the giving of instructions are urged, which errors have resulted from the failure of the trial judge to reduce his instruction to writing prior to delivering them to the jury. It is impossible for the most skilled attorney who has carefully prepared a case to accurately orally state the rules of law without the assistance of written memoranda. This task is even more difficult for the trial judges. . . . It is by far the better practice to reduce instructions to writing before delivering them to the jury, thus avoiding the possibilities of inadvertent error."

There is much to be said for the point of view expressed in the foregoing warning. Some judges possess more impromptu forensic aptitude than others. But few are gifted to the extent that off-the-cuff utterances can be guaranteed always to be accurate within the limits of permissible tolerance. And wise indeed is the trial judge who can unfailingly foretell where the several appellate courts will fix the embracive boundaries of "permissible tolerance." Considerable chagrin must attend realization by a judge that he has messed up a worthy case, carefully prepared and tried, by error in extemporaneously interposed remarks during instruction; error which a reviewing court deems to be prejudicial and to require reversal.

We find no error of that proposition here. This case in our opinion was not a close one. It is difficult to understand how Maroney on a clear night with no impairment of visibility could have so badly misjudged the hazard of the approaching Howarth vehicle as to venture across the highway in front of it—even assuming the latter's speed to have been in excess of that admitted. We share the jury's implied finding that the factual picture is one where Maroney's clear obligation was to yield the right of way, a duty which he failed to discharge.

The judgment is affirmed.

Schottky, J., and Friedman, J., concurred.